LAWSUIT FINANCIAL, LLC v CURRY

Docket No. 243011. Submitted January 6, 2004, at Detroit. Decided February 5, 2004. Approved for publication April 15, 2004, at 9:05 A.M.

Lawsuit Financial, L.L.C., brought an action in the Oakland Circuit Court against Mary Curry and the law firm of Fieger, Fieger, Kenney & Johnson, P.C., alleging breach of contract and conversion by Curry and tortious interference with a contract and conversion by the Fieger firm. The plaintiff had advanced Curry a total of $177,400 after Curry, while represented by the Fieger firm, obtained a $27 million jury verdict in a personal injury action. The advances were made under a series of agreements by which Curry agreed to repay the plaintiff the greater of $887,500 or ten percent of money she recovers from her personal injury action. Curry signed a lien in favor of the plaintiff and signed a notice of lien that informed the Fieger firm of the plaintiff's interest in part of the proceeds from the personal injury action. A judgment of $4,786,144.80 was eventually entered in favor of Curry in her personal injury action after a remittitur of damages. The plaintiff in this case brought its action against Curry and the Fieger firm after its demands for payment of $887,500 were rejected. The court, Rudy J. Nichols, J., granted summary disposition for the defendants but ordered them to pay the $177,400 loan principal. The plaintiff appealed.

The Court of Appeals *held*:

1. The trial court did not err in granting summary disposition for Curry. The advances made by the plaintiff were actually loans because, despite the language in the agreements stating that repayment was contingent on Curry's recovery, the right to repayment was absolute because the plaintiff and Curry entered into those agreements long after the defendants in the personal injury action admitted liability and after the jury returned a $27 million verdict. The plain language of the agreements does not support the plaintiff's contention that it would not receive repayment from Curry unless Curry recovered at least $2.3 million. The agreements identified no assignment, lien, encumbrance or security interest in Curry's recovery that would be superior to the plaintiff's interest. Pursuant to MCL 438.31 and MCL 438.32, the

maximum lawful annual interest rate is seven percent and lenders that charge interest in excess of that rate, as the plaintiff in this case does, are barred from recovering any interest, late fees, court costs, or attorney fees.

2. The trial court did not err in granting summary disposition for the Fieger firm with respect to the claim of common-law conversion. To support an action for conversion of money, the defendant must have obtained the money without the owner's consent to the creation of a debtor-creditor relationship and must have had an obligation to return the specific money entrusted to his care. The plaintiff failed to allege facts establishing that the Fieger firm obtained the litigation proceeds without Curry's consent. Furthermore, because the transactions at issue were usurious loans contrary to MCL 438.31 and MCL 438.32, the plaintiff never had a property interest in the funds it demanded and the Fieger firm cannot be deemed to have converted proceeds in which the plaintiff lacked a property interest.

3. The trial court correctly concluded that the plaintiff failed to state a claim for statutory conversion. Statutory conversion, MCL 600.2912a, consists of knowingly buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property. Simply retaining money, as the Fieger firm did in this case by placing the litigation proceeds in a client trust account, does not amount to buying, receiving, or aiding in the concealment of stolen, embezzled, or converted property.

4. The trial court correclty concluded that the plaintiff failed to state a claim of tortious interference with a contract. To maintain a cause of action for tortious interference, the plaintiff must establish that the defendant was a third party to the contract rather than an agent of one of the parties acting within the scope of its authority as an agent. Here, the Fieger firm was an agent of Curry, who was a party to the agreements with the plaintiff.

Affirmed.

*Wasinger Kickham and Hanley* (by *Stephen Wasinger* and *Gregory D. Hanley*) for the plaintiff.

*Hyman Lippitt, P.C.* (by *J. Leonard Hyman*), for the defendants.

Before: OWENS, P.J., and SCHUETTE and BORRELLO, JJ.

PER CURIAM. Plaintiff appeals as of right from the trial court's order that granted summary disposition to defendants pursuant to MCR 2.116(C)(8) and (10) and dismissed plaintiff's common-law conversion claim against defendant Fieger, Fieger, Kenney & Johnson, P.C. Plaintiff, a litigation funding company in the business of making nonrecourse capital advances to litigants in need of funds, had filed claims of breach of contract and conversion against defendant Mary Curry for her failure to abide by the payment terms of their agreements and filed conversion and tortious interference claims against defendant Fieger, a law firm that represented Curry, for failing to disburse to plaintiff certain funds from the litigation proceeds that defendant Curry received from her personal injury lawsuit. We affirm.

### I. FACTS

Plaintiff alleges the following in its first amended complaint (complaint). Plaintiff's business makes "nonrecourse capital advances" to plaintiffs during the pendency of their lawsuits to cover expenses such as medical expenses, expert costs and fees, investigative expenses, or other costs associated with litigation. The capital advances are contingent because repayment of the advance depends on the successful resolution of the case for which the advance was made. If the client does not recover in his lawsuit, he is not obligated to repay the advance. However, if the client recovers, plaintiff typically receives the return of its advance, plus "an agreed-upon level of profit on its investment." The advances are not loans because the client's obligation to repay the advance depends on the successful resolution of a lawsuit.

On November 7, 1994, defendant Curry suffered personal injuries resulting from an automobile accident and retained defendant Fieger to sue the allegedly responsible party for damages. In early 2000, during the pendency of defendant Curry's lawsuit, she approached plaintiff to seek a contingent advance and plaintiff advanced defendant Curry funds on three separate occasions.

On April 19, 2000, plaintiff and defendant Curry entered into a "Transfer and Conveyance of Proceeds and Security Agreement" (agreement) under which plaintiff advanced defendant Curry $75,000 and defendant Curry agreed that, if she recovered in her lawsuit, she would share that recovery with plaintiff according to the formula set forth in the agreement. On July 28, 2000, plaintiff and defendant Curry entered into a second agreement that superseded and replaced the first agreement (first amendment) and plaintiff advanced defendant Curry an additional $100,000. As under the agreement, defendant Curry again agreed that if she recovered money from the lawsuit, she would share that recovery with plaintiff according to the formula set fort in the first amendment. Defendant Curry also signed a lien in plaintiff's favor and signed a notice of the lien that notified defendant Fieger about the assignment of funds to plaintiff and instructed defendant Fieger to follow defendant Curry's instructions regarding the disbursement of payments to plaintiff.

On October 19, 2000, plaintiff advanced defendant Curry $2,500, and the two parties entered into yet another agreement (second agreement) in exchange for which defendant Curry again agreed to share any monetary recovery with plaintiff. Plaintiff advanced a total sum of $177,500 to defendant Curry and is entitled

to $887,500 or 10 percent of the proceeds of any recovery in the lawsuit, whichever is greater.

After defendant Curry settled the lawsuit for $4.7 million, plaintiff repeatedly demanded that defendants pay it $887,500 as provided in the agreement. The plaintiff alleged that despite repeated inquiries, defendants have not divulged the status of the funds, defendant Curry has converted the funds for her own benefit, and defendant Fieger has aided and abetted that conversion. The plaintiff further alleged that defendant Curry breached her contract with plaintiff by failing to pay plaintiff the sums due under the agreements and first amendment. In addition, plaintiff alleged that defendant Fieger tortiously interfered with the contractual relationship between defendant Curry and plaintiff and that defendant Fieger committed common-law conversion.

On August 1, 2001, defendant Fieger moved for summary disposition pursuant to MCR 2.116(C)(8), arguing that plaintiff failed to state a claim for statutory conversion because an action may not be maintained in tort for the conversion of money, *Thrift v Haner*, 286 Mich 495, 497-498; 282 NW 219 (1938), and because defendant Fieger lawfully came into possession of the litigation proceeds. Defendant Fieger further argued that plaintiff failed to establish a claim of tortious interference because plaintiff failed to allege facts that defendant Fieger did anything wrongful or that it acted lawfully but with malice.

Plaintiff, on the other hand, argued that it did state a claim for statutory conversion. According to plaintiff, it had an absolute and unconditional right to $887,500 of the litigation proceeds, which are specific and identifiable and therefore capable of being converted. Plaintiff argued that defendant Fieger wrongfully and inten-

tionally controlled plaintiff's portion of the funds because it knew about plaintiff's interest in the funds and had express instructions from defendant Curry to transfer $887,500 to plaintiff but failed to do so. Plaintiff further argued that it stated a claim for tortious interference because defendant Fieger was aware that plaintiff had a contract with defendant Curry and it intentionally interfered with that contract by inducing defendant Curry to breach it.

On October 10, 2001, the trial court issued a written order and opinion granting defendant Fieger's summary disposition motion and dismissing plaintiff's counts for statutory conversion and for tortious interference. In particular the trial court found that plaintiff failed to state a claim for statutory conversion because defendant Fieger lawfully received the judgment proceeds and because property that rightfully comes into a defendant's possession is not converted just because another claims a right to it. The court also determined that plaintiff failed to establish tortious interference because only a third party to a contractual relationship may be sued for tortious interference and defendant Fieger is defendant Curry's agent and not a third party.

After plaintiff moved to amend its complaint to assert a claim for common-law conversion, the trial court granted that motion in an order entered on January 22, 2002. Thus, plaintiff filed an amended complaint in January of 2002 adding a claim of common law conversion against defendant Fieger as count VI of the complaint. In the court's final order, it ruled that there is no cause of action with respect to all of plaintiff's claims against defendant Fieger. Thus, the trial court subsequently dismissed plaintiff's common-law conversion claim against defendant Fieger.

On January 31, 2002, defendant Curry moved for partial summary disposition pursuant to MCR 2.116(C)(10) on the grounds that the transactions are usurious loans and that plaintiff is seeking annual interest rates ranging from 200 percent and 370 percent, contrary to MCL 438.31, which establishes a maximum legal interest rate of seven percent, and MCL 438.41, which sets the criminal usury rate at twenty-five percent a year. In addition, defendant Curry argued that, although plaintiff attempts to describe the loans as advances contingent on recovery, there is no genuine issue of fact that, at the time of the loan transactions, defendant Curry had already received a favorable jury verdict in the amount of $27 million, and the only remaining proceedings were a motion for remittitur and a determination of the propriety of the exemplary damages. Thus, defendant Curry's recovery was not a "risk" but a "certainty."

In addition, defendant Curry argued that the transactions were unconscionable because plaintiff knew defendant Curry had a lengthy history of mental instability and was in dire need of funds and yet it used its sophistication and business savvy to enter into an agreement that demanded an annual interest rate between 200 percent and 370 percent.

Plaintiff filed its response brief on March 1, 2002, arguing that the agreements with defendant Curry were not usurious loan transactions because defendant Curry's obligation to repay the advances was contingent on the successful resolution of the lawsuit, and not on an event over which plaintiff had control. Plaintiff further argued that the agreement was not procedurally unconscionable because defendant Curry sought out plaintiff, was represented by counsel, was not pressured or desperate for money, and received re-

peated explanations regarding the terms of the agreement before she signed it. Plaintiff further argued that the agreement was not substantively unreasonable because defendant Curry received almost $200,000 risk-free in exchange for a portion of her speculative recovery.

During the April 17, 2002, motion hearing, the parties rested on the arguments presented in their briefs. The court denied the motion, finding that plaintiff did not provide the court with evidence that the Curry litigation was being appealed and that the court could not determine whether damages, other than Curry's exemplary damage claim, were reduced. Thus, the court stated it lacked sufficient information to determine whether the transactions at issue were legally permissible or were usurious loans.

On April 23, 2002, defendant Curry again moved for partial summary disposition pursuant to MCR 2.116(C)(10). This time, defendant provided the court with an order of the Genesee Circuit Court entered on April 9, 2001, that reduced the award of damages to $4,787,144.80.

On May 24, 2002, plaintiff filed its brief in opposition to defendant Curry's supplemental motion for summary disposition. There it argued that because defendant Curry had to recover at least $2.3 million for plaintiff to receive payment (because of defendant Fieger's contingent fee and because defendant Curry owed $1.2 million to a superior lien creditor), and because it was not certain that defendant Curry would recover at least $2.3 million, plaintiff was assuming some risk in advancing defendant Curry the funds. Thus, because it was uncertain whether defendant Curry would recover $2.3 million, the court could not find that plaintiff's transactions constituted usurious loans.

A hearing was held on defendant's April 23, 2002, summary disposition motion on July 3, 2002. At the motion hearing, the parties again rested on the arguments that they presented in their briefs. The court found that the three transactions at issue were loans rather than gifts.

The court found that, in spite of the "contingent" language in the agreements, there was an exception for the security interest and the litigation, and the court read a paragraph that granted plaintiff right, title, and interest in the first $375,000 recovered from the litigation, an amount that would increase by $75,000 every six months or, in contrast, five percent of the total settlement or judgment recovered. The court noted that the second agreement provided that plaintiff was entitled to $875,000 or ten percent, whichever was greater, and that third agreement provided that plaintiff was entitled to an additional $12,500 or one percent of the judgment, whichever was greater. The court further found that defendant Curry obtained a judgment in the underlying suit before the agreements were executed and, therefore, the agreements at issue were for loans. Further, because the court determined that plaintiff's demand for $887,000 greatly exceeds the seven percent statutory limit on interest for loans set forth in MCL 438.31, the transactions were usurious loan transactions. Accordingly, the court granted defendants summary disposition and noted that plaintiff was entitled to recover the principal balance of the loan, which was $177,500.

The trial court subsequently entered orders granting defendant Curry summary disposition pursuant to MCR 2.116(C)(10), dismissing plaintiff's claims against defendant Fieger, and ordering defendant Curry to pay plaintiff the principal balance of the loan.

## II. USURIOUS LOANS

Plaintiff first argues that the trial court erred in granting defendant Curry summary disposition pursuant to MCR 2.116(C)(10) because the court erred in finding that the transactions at issue are usurious loans. Reviewing a motion for summary disposition de novo, *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999), we disagree.

Contrary to plaintiff's arguments, the "contingent advances" were actually loans. "The hallmark of a loan is the *absolute* right to repayment." *Blackwell Ford, Inc v Calhoun*, 219 Mich App 203, 209; 555 NW2d 856 (1996) (emphasis in the original). The word "loan" implies an advance of money with an absolute promise to repay. *Id.*, 209-210, quoting *People v Lee*, 447 Mich 552, 559; 526 NW2d 882 (1994).

We believe that the transactions at issue here were loans because at the time the advances were made, plaintiff had an absolute right to repayment. In support of its argument that plaintiff did not have an absolute right to repayment, plaintiff directs us to language in the agreements that states that repayment is contingent on defendant Curry's recovery. Despite that language in the agreements, we conclude that the right to repayment was absolute because the parties entered into those agreements long after the defendants in the underlying personal injury suit admitted liability and after the jury returned a verdict of $27 million in damages.

The defendants in defendant Curry's personal injury lawsuit admitted liability in their pleadings in advance of trial. On the issue of damages, the jury returned a verdict in the amount of $27 million, and an order of judgment was entered on April 10, 2000. Plaintiff did

not make the first advance until April 19, 2000, nine days after the original order of judgment was entered in the personal injury lawsuit.

Though the trial court subsequently struck the $20 million jury award for exemplary damages and ended up reducing the underlying $7 million in ordinary damages to a total judgment of $4,786,144.80 for defendant Curry after the court's December 22, 2000, opinion relating to damages, at the time that the advances were made, defendant Curry was certain to recover some damages. There is no genuine issue of material fact that before the advances were made, the defendants in the personal injury lawsuit had already admitted liability, the jury had already returned a $27 million verdict in defendant's favor, an order of judgment had already been entered, and the only remaining issue was the amount of recovery, i.e., whether defendant Curry was entitled to exemplary damages and whether the verdict on damages was excessive. Because liability had already been admitted when plaintiff advanced the funds, the fact that defendant Curry would recover some damages for her injuries was already known. Therefore, plaintiff was entitled to an absolute right of repayment.

Nor are we persuaded by plaintiff's argument that, under the terms of the agreements, it could not recover any funds unless defendant Curry recovered at least $2.3 million from the personal injury lawsuit because of the existence of a superior lien encumbrance for $1.2 million, and attorney fees due in the amount of $900,000. None of the agreements mentions any other liens or encumbrances. On the contrary, each of the agreements provides that "there is not [sic] other assignment, lien, encumbrance or security interest of any kind or nature in or relating to the Proceeds other

than is provided for in Schedule A hereto, if any."
Schedule A of those agreements does not mention any
other liens.

In addition, the language of the April 19, 2000,
agreement further undermines this argument because
it provides that defendant Curry transfers to plaintiff
her control in the first $375,000 she receives from the
proceeds and further provides that defendant Curry
grants plaintiff a security interest in the greater of
either $375,000 of the proceeds of the litigation or five
percent of the total settlement or judgment recovered.
Clearly, the plain language of the agreements makes it
plain that the parties did not agree that plaintiff would
receive nothing unless defendant Curry recovered at
least $2.3 million. Under ordinary contract principles,
contract language should be given its ordinary and
plain meaning. *Michigan Nat'l Bank v Laskowski*, 228
Mich App 710, 714; 580 NW2d 8 (1998).

Here, limiting our review to the plain language of the
contracts at issue, as we are required to do, we note that
the contracts do not mention any superior lien encum-
brances or any minimum amount of damages that
defendant Curry must receive before she becomes obli-
gated to pay plaintiff. Thus, plaintiff's argument lacks
merit. Further, because at the time plaintiff advanced
defendant Curry the funds, plaintiff had an absolute
right to repayment, the trial court correctly concluded
that the transactions at issue were loans rather than
"contingent advances."

Moreover, the loans were "usurious" contrary to
Michigan Law. Pursuant to MCL 438.31 and MCL
438.32, the maximum lawful annual interest rate is
seven percent and lenders that charge interest in excess
of that rate are barred from recovering any interest,
late fees, or attorney fees, and the borrower is entitled

to recover his attorney fees from the lender. Here, plaintiff loaned defendant Curry $177,500 and shortly thereafter demanded payment of $887,500. Without a doubt, the interest rate plaintiff charged exceeded the legal rate. Accordingly, the loans were usurious and plaintiff is barred by statute from recovering any interest, fees, late charges, court costs, or attorney fees. We therefore conclude that the court properly granted defendant Curry summary disposition.

### III. STATUTORY CONVERSION, TORTIOUS INTERFERENCE, AND COMMON-LAW CONVERSION

Plaintiff next argues that the trial court erred in granting defendant Fieger summary disposition regarding plaintiff's statutory conversion and tortious interference claims, and in dismissing plaintiff's common-law conversion claim. Again, reviewing this issue de novo, *Maiden, supra*, we disagree.

Conversion is defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins Co v Allstate Ins Co*, 439 Mich 378, 391; 486 NW2d 600 (1992). To support an action for conversion of money, the defendant " 'must have obtained the money without the owner's consent to the creation of a debtor-creditor relationship' " and "must have had an obligation to return the specific money entrusted to his care." *Head v Phillips Camper Sales & Rental, Inc*, 234 Mich App 94, 111-112; 593 NW2d 595 (1999) (citation omitted). Though the tort is an intentional tort because the converter's acts are willful, one can also commit this tort while being unaware of the plaintiff's property interest. *Foremost, supra*, 391.

In the present case, plaintiff failed to state a claim for common-law conversion because it failed to allege that

defendant Fieger's initial exercise of domain over the property was in fact wrongful. " 'The defendant must have obtained the money without the owner's consent to the creation of a debtor and creditor relationship.' " *Head, supra,* 112 (citation omitted). Here, plaintiff failed to allege facts establishing that defendant Fieger obtained the litigation proceeds without defendant Curry's consent. The first amended complaint merely alleges that defendant Fieger "knowingly, intentionally and wrongfully exercised dominion and control over [plaintiff's] share of the Funds for its own benefit, use and purpose." A mere statement of a pleader's conclusions, unsupported by allegations of fact, will not suffice to state a cause of action. *Churella v Pioneer State Mut Ins Co,* 258 Mich App 260, 272; 671 NW2d 125 (2003).

Furthermore, although plaintiff relies on *Munro v Munro,* 168 Mich App 138, 141-142; 424 NW2d 16 (1988), for the proposition that attorneys with knowledge of another's lien on settlement proceeds have an obligation to disburse liened funds to the lienholder, plaintiff's argument overlooks the fact that it was not entitled to $887,500 of "liened funds" because the transactions at issue were usurious loans contrary to MCL 438.31 and MCL 438.32. Therefore, plaintiff never had a property interest in the funds that it demanded, and defendant Fieger cannot be deemed to have converted proceeds in which plaintiff lacked a property interest. Because plaintiff lacked a property interest in $877,500 of the litigation proceeds, it failed to state a claim for common-law conversion. Accordingly, we hold that the trial court properly concluded that plaintiff failed to state a cause of action for common-law conversion.

We also believe that plaintiff failed to state a claim of statutory conversion. Statutory conversion consists of

knowingly buying, receiving, or aiding in the conceal-
ment of any stolen, embezzled, or converted property.
*Head, supra*; MCL 600.2919a. This Court has ruled that
simply retaining money does not amount to "buying,
receiving or aiding in the concealment of stolen, em-
bezzled or converted property." *Hovenesian v Nam*, 213
Mich App 231, 237; 539 NW2d 557 (1995). According to
defendant Fieger, it had placed the litigation proceeds in
a client trust account, which essentially amounts to
retaining money. Further, although plaintiff relies on
*Shelton & Assoc, PC v Mayer*, unpublished opinion per
curiam of the Court of Appeals, issued June 12, 2001
(Docket No. 217456), for its claim that defendant Fieger
converted liened funds, *Shelton* is an unpublished case
that involved conversion resulting from an attorney's
failure to return an overpayment to his client. It did not
address the alleged wrongfulness of an attorney's fail-
ure to disburse proceeds to a third party who lacked a
property interest in $887,500 of those proceeds. We
therefore hold that the trial court correctly concluded
that plaintiff failed to state a claim for statutory con-
version.

We also find that the trial court correctly concluded
that plaintiff failed to state a claim of tortious interfer-
ence with a contract. To maintain a cause of action for
tortious interference, the plaintiff must establish that
the defendant was a "third party" to the contract rather
than an agent of one of the parties acting within the
scope of its authority as an agent. *Reed v Michigan
Metro Girl Scout Council*, 201 Mich App 10, 13; 506
NW2d 231 (1993). Here, because defendant Fieger
represented defendant Curry in the personal injury
lawsuit, it is her agent, rather than an independent
third party. Although plaintiff contends that a lawyer
can be liable for tortiously interfering with his client's
contracts with third parties, plaintiff cites no binding

precedent in support of this assertion and this Court is not required to search for such authority. *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998). Thus, we conclude that the trial court correctly dismissed plaintiff's count of tortious interference against defendant Fieger.

Affirmed.